Harry HUDGINS and Lee Hudgins,
Plaintiffs,

v.

The LINCOLN NATIONAL LIFE IN-SURANCE COMPANY and Shell Oil Company, Defendants.

Civ. A. No. 1077.

United States District Court
E. D. Texas, Sherman Division.

July 10, 1956.

Joe A. Keith, of Keith & Kennedy, Sherman, Texas, for plaintiffs.

Carlisle Cravens and Emory Cantey, of Cantey, Hanger, Johnson, Scarborough & Gooch, Fort Worth, Tex., for Lincoln Nat. Life Ins. Co.

Jesse M. Davis, Joseph W. Morris, Tulsa, Okl., for Shell Oil Co.

SHEEHY, Chief Judge.

The plaintiffs, Harry Hudgins and Lee Hudgins, and each of them, are residents and citizens of the State of Texas. The defendant, The Lincoln National Life Insurance Company, hereinafter referred to as Lincoln, is a corporation organized and existing under and by virtue of the laws of the State of Indiana, and the defendant, Shell Oil Company, hereinafter referred to as Shell, is a corporation organized and existing under and by virtue of the laws of the State of Delaware. The matter in controversy herein exceeds the sum and value of $3,000, exclusive of interest and cost.

Plaintiffs are seeking to have their rights as to certain oil and gas leases covering two tracts of land in Grayson County, Texas, declared and by way of alternative plea plaintiffs seek to recover damages against Lincoln because of certain alleged wrongful conduct on the part of Lincoln with reference to the oil and gas leases in question. Plaintiffs seek no recovery against Shell but made Shell a party to this suit in order that all parties claiming any interest in the oil and gas leases in question would be before the Court. Lincoln, in addition to denying that plaintiffs are entitled to any of the relief sought, by way of cross-action over and against the plaintiffs and Shell, seeks a partition of the mineral estate in the two tracts of land in question.

On and before September 22, 1936, Lincoln was the owner of the two tracts of land situated in Grayson County, Texas, and herein involved. One tract of land, which will hereinafter be referred to as the First Tract, contained approximately 60 acres. The other tract, which will hereinafter be referred to as the Second Tract, contained approximately 74 acres. By general warranty deed dated September 22, 1936, which deed is recorded in Volume 388, Page 512 of the Deed Records of Grayson County, Texas, Lincoln conveyed to Randolph Bryant the two tracts of land just mentioned. This deed contained a reservation unto Lincoln in the following language:

"There is reserved unto Grantor an undivided one-half (½) interest in the oil, gas and other minerals in, under and on said property *but shall not be entitled to receive any part of any bonuses paid by leases or any part of the rentals that may be paid for the privilege of deferring the commencement of a well or drilling operations.*" (Emphasis supplied.)

By May 10, 1950, Harry Hudgins had acquired by mesne conveyances all of the right, title and interest in the two tracts in question that was acquired by Randolph Bryant by the deed from Lincoln to Randolph Bryant above mentioned. On October 27, 1950, Harry Hudgins conveyed the Second Tract, above mentioned, to the plaintiff, Lee Hudgins. The plaintiffs, and each of them, have at all times contended and still contend that Harry Hudgins from the time he acquired title to the two tracts in question up to the time he conveyed the Second Tract to Lee Hudgins had the right to subject the entire mineral estate in both tracts, including the interest of Lincoln, to the terms of an oil and gas and other minerals leases, and that since Lee Hudgins acquired title to the Second Tract, Lee Hudgins had that right as to the Second Tract.

On May 10, 1950, Harry Hudgins acquired and delivered to one J. N. Ingraham two oil and gas leases, one covering the First Tract and the other covering the Second Tract for a primary term of five years from and after May 10, 1950. These leases provided for the usual and customary one-eighth royalty and the payment annually of a delay rental of $1 per acre. The bonus paid Hudgins for these leases was $15 per acre in cash and $15 per acre to be paid out of one-

sixteenth of seven-eighths of the oil and gas produced from said tracts if, as and when oil and gas are produced therefrom. The entire cash bonus of $15 per acre on the entire acreage covered by these leases was paid Hudgins. These leases were acquired by Ingraham for Shell and within a few days after said leases were acquired by Ingraham, Ingraham duly assigned and transferred said leases to Shell. Shell paid the delay rentals on said leases as provided in said leases to the end that during all the month of September, 1954, said leases were in full force and effect. Both tracts of land in question are located a short distance east of Pottsboro, Texas, with the Second Tract being located a short distance north of the First Tract. These leases were acquired by Shell as a part of a wildcat play Shell was making in the general area of these tracts. The play was being made for a formation known as the Pennsylvania and which was considered to be in excess of 7,000 feet in depth. In September, 1954, and as a part of this play, Shell was drilling a wildcat well known as the Brown well. The Brown well was located a short distance south of the First Tract. A few days prior to September 22, 1954, a drillstem test of the Pennsylvania formation in the Brown well was favorable for oil. As a result of that test Shell decided to drill a second wildcat well in the area of the play covering the two tracts in question. It was decided that this second well would be drilled on the L. Hudgins tract located in the J. G. Thompson Survey and which tract was east of and one tract removed from the Second Tract. In view of the favorable show in the Brown well and the decision to drill the second wildcat well on the L. Hudgins tract and in view of the further fact that some of Shell leases in the area of this play, including the leases on the two tracts in question, would expire within less than a year, Shell decided to attempt to acquire new leases on the lands in the area of the play, including the two tracts in question, in order that, in the event the Brown well and the wild-

cat well on the L. Hudgins tract proved the area to be productive, Shell could drill and develop the lands in that area covered by its leases in an orderly manner and without having to do so under distressed conditions because of the shortness of the time in which the leases as originally taken would remain in force. Pursuant to that decision Shell contacted the plaintiffs in an effort to obtain new leases on the tracts in question in lieu of the May 10, 1950, leases, above referred to. As a result of the negotiations in that respect, Harry Hudgins on or about September 22, 1954, executed and delivered to Shell a new oil and gas lease covering the First Tract for a primary term of five years from and after September 22, 1954. On the same date Lee Hudgins and wife executed and delivered to Shell an oil and gas lease for a primary term of five years from and after September 22, 1954, covering the Second Tract. These leases superseded the May 10, 1950, leases previously executed by Harry Hudgins, and above referred to, and provided for the usual and customary one-eighth royalty and for the payment of an annual delay rental of $1 per acre. The bonus Shell agreed to pay in the case of each of said leases dated September 22, 1954, was the sum of $107.50 per acre. The plaintiffs, and each of them, believing that they had the right to subject the entire mineral estate to such oil and gas leases intended and purported to cover the entire mineral estate in the two tracts of land in question in said oil and gas leases.

At the time the last-mentioned leases were obtained in September, 1954, Shell knew that Lincoln contended that the plaintiffs had the right to subject only one-half of the mineral estate in the lands in question to an oil and gas lease. Knowing that contention on the part of Lincoln, Shell paid to plaintiffs only half of the bonus to be paid for said leases and retained the other half under letter agreements between Shell and the plaintiffs to the effect that the remaining half of the bonus agreed to be paid for the

leases would be paid to plaintiffs if plaintiffs are able to secure a ratification of the leases from Lincoln or are able to establish by final judgment of a court of competent jurisdiction that the leases executed by the plaintiffs on September 22, 1954, cover the interest of Lincoln in the mineral estate in the tracts in question. As to the First Tract, Shell paid to Harry Hudgins in cash one-half of the agreed bonus or the sum of $3,-217.48 and as to the Second Tract Shell paid to Lee Hudgins one-half of the bonus agreed upon as to that tract or the sum of $3,981.27. Under the letter agreements, above mentioned, Shell as to the First Tract retained $3,217.48 of the agreed bonus and as to the Second Tract Shell retained $3,981.27 of the agreed bonus.

Subsequent to the execution by Hudgins of the 1950 lease, above referred to, Lincoln was requested to ratify said lease but it refused to do so. Thereafter, in an effort to remove any doubt as to the 1950 lease covering the entire mineral estate, Shell offered Lincoln a production payment of $15 per acre for a ratification of said lease. Lincoln refused this proposal and offered to negotiate only on the basis of a ¼th royalty or some unspecified net profit arrangement. The next contact between Shell and Lincoln was in March, 1954, at which time Lincoln maintained its same position, namely, that it was unwilling to negotiate on any basis other than a basis that would allow Lincoln an excess royalty. In May, 1954, Shell, in an effort to settle the problem, undertook further negotiations with Lincoln and finally offered Lincoln a 3⁄16ths royalty for the ratification of the 1950 lease, which offer was refused by Lincoln. Lincoln insisted on a ¼th royalty and never receded from that position. Lincoln at all times refused to bargain on any basis that would allow a bonus but insisted on bargaining only on the basis of it obtaining excess royalty.

It is a matter of common knowledge that in Texas the usual and customary royalty provided for in an oil and gas lease is ⅛th of the oil or gas produced from the premises covered by the lease, and there are statements by the courts of Texas recognizing such royalty as the usual royalty provided for in an oil and gas lease.[1] Even though it might be said that a ⅛th royalty is the usual and customary royalty it must be recognized that the parties to an oil and gas lease can contract for a royalty of less than ⅛th or for a royalty in excess of ⅛th.[2]

At the time the leases in question were executed by the plaintiffs in September, 1954, the reasonable cash market value of said leases at that time and under the circumstances then existing was the consideration Shell agreed to pay for said leases, namely, a cash bonus of $107.50 per acre with an annual delay rental of $1 per acre and a royalty to the lessor of ⅛th. I also find that under the circumstances existing at that time a royalty of ⅛th was a fair and reasonable royalty.

The plaintiffs contend that under the reservation in the deed from Lincoln to Bryant, above referred to, the interest in the mineral estate reserved to Lincoln is in the nature of a royalty interest and that the plaintiffs have the right to subject the entire mineral estate in the tracts in question to an oil and gas lease. Lincoln contends that under the reservation it reserved unto itself a mineral interest of one-half of the minerals in place and that although plaintiffs are entitled to all bonuses and delay rentals paid for and under oil and gas leases covering the entire mineral estate plain-

1. Morriss v. First National Bank of Mission, Tex.Civ.App., 249 S.W.2d 269, 277 (Writ of Error Refused N.R.E.); Sheppard v. Stanolind Oil & Gas Co., Tex. Civ.App., 125 S.W.2d 643, 648 (Writ of Error Refused); and United North & South Oil Co. v. Meredith, Tex.Civ.App., 258 S.W. 550, 557 (affirmed by Supreme Court of Texas, United North & South Oil Co. v. Meredith, Tex.Com.App., 272 S.W. 124).

2. Morriss v. First National Bank of Mission, supra.

tiffs do not have the right to subject Lincoln's interest in the mineral estate to an oil and gas lease. If plaintiffs' contention is correct, the September, 1954, leases, above referred to, cover the entire mineral estate in the two tracts of land in question. On the other hand, if Lincoln's contention is correct, said leases cover only an undivided one-half interest in the mineral estate.

Plaintiffs by their alternative plea contend that if Lincoln's construction of the reservation is correct, Lincoln's conduct under the circumstances in refusing to ratify the September, 1954, leases was wrongful and because thereof they are entitled to recover from Lincoln their damages resulting from such wrongful conduct, which damages they contend to be the sum of $7,198.75, the one-half of the bonus Shell agreed to pay for said leases, the payment of which Shell is withholding under the letter agreements between Shell and the plaintiffs, above referred to. Since Lincoln has refused to ratify the leases, there can be no question but that Harry Hudgins has been damaged in the sum of $3,217.48 and that Lee Hudgins has been damaged in the sum of $3,981.27 in the event it should be determined that Lincoln's construction of the reservation in question is correct. However, in view of the construction that is to be given the reservation in question, the questions presented by plaintiffs' alternative plea will not be reached or determined.

Do the plaintiffs have the right to subject the entire mineral estate in the two tracts in question to an oil and gas lease, including the interest of Lincoln? The answer to that question requires a construction of the reservation contained in the deed from Lincoln to Bryant and above quoted.

Lincoln by inserting the reservation necessarily contemplated the leasing of the lands covered by the deed for oil and gas.[3] Although under the terms of said reservation the grantee was to receive any and all bonuses and delay rentals paid for or under the terms of any oil or gas lease covering the lands or any part thereof, there is no express provision in the reservation or elsewhere in the deed with reference to the execution of oil and gas leases or as to which party shall have the right to execute oil and gas leases covering the lands or any part of them.

The courts of Texas follow certain rules of construction concerning the construction of deeds and such of those rules as are pertinent here are as follows:

■ (1) The cardinal rule for the construction of deeds is to ascertain and give effect to the intention of the parties as gathered from the entire instrument, together with the surrounding circumstances, unless that intention is in conflict with some unbending canon of construction or settled rule of property, or is repugnant to the terms of the grant;[4]

■ (2) Since the language of the deed is that of the grantor, if there is any doubt as to its construction it should be resolved against him and in favor of the grantee;[5]

■ (3) If the language employed in a deed leaves in doubt the grantor's intention, it should be construed so as to confer upon the grantee the greatest estate that the terms of the instrument will permit.[6]

3. Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543; and Klein v. Humble Oil & Refining Co., 126 Tex. 450, 86 S.W.2d 1077.

4. Hedick v. Lone Star Steel Co., Tex. Civ.App., 277 S.W.2d 925, 928 (writ of error refused, N.R.E.); and 14–B Tex. Jur. Sec. 125, p. 574.

5. Humble Oil & Refining Co. v. Harrison, 146 Tex. 216, 205 S.W.2d 355; and Hedick v. Lone Star Steel Co., supra.

6. Davis v. Skipper, Tex.Com.App., 125 Tex. 364, 83 S.W.2d 318; Hedick v. Lone Star Steel Co., supra; Roswurm v. Sinclair Prairie Oil Co., Tex.Civ.App., 181 S.W.2d 736 (writ of error refused— want of merit); and Spell v. Hanes, Tex.Civ.App., 139 S.W.2d 229 (writ of error dismissed—correct judgment).

Neither party has cited a case involving the construction of a reservation in substantially the language of the reservation here in question, and I have been unable to find such a case. Probably the case in which the reservation more nearly resembles the reservation here in question is the case of Klein v. Humble Oil & Refining Co., supra, which case is relied on heavily by plaintiffs. In that case one Stein and wife had conveyed a 60-acre tract by General Warranty Deed to Klein, reserving, however, ⅛th of the mineral rights in the east 10 acres. The pertinent language of that reservation is [126 Tex. 450, 86 S.W.2d 1078]:

" ' "Grantors, herein, however, reserve for themselves, their heirs and assigns, one-eighth (⅛) of all mineral rights in and under Ten (10) acres of land, running north and south, on the east end of the 60 acres herein conveyed, * * * and it is further understood that grantors herein are not to participate in any oil lease or rental bonuses that may be paid on any lease on said above described land, and hereby waive any rights they may have or be entitled to in any future oil or gas lease." ' "

Later Klein conveyed the same property to Baker. One of the questions before the Court was whether Baker had the power and authority to subject Stein's interest to an oil and gas lease which Baker had executed in favor of one Weinert. Subsequent to the conveyance from Stein to Baker, Stein and Baker executed an instrument in writing in which it was stated, in effect, that it was not necessary for Stein to join in the lease from Baker to Weinert because Stein's interest was only a royalty interest, and that Stein waived all of his rights in any oil or gas lease covering the lands originally conveyed by Stein and wife to Klein. As the Court pointed out, this last-mentioned instrument had the effect of removing any and all doubt as to the necessity for Stein joining in the lease from Baker to Weinert. However, the following language from the opinion in that case indicates that the Court in the absence of this instrument signed by Stein and Baker would have held that Baker had the power and authority to include the Stein interest in his lease to Weinert:

"Our conclusions are, (1) that Baker had the power and authority to include the Stein interest in his lease to Weinert, * * *.

"It is our duty to ascertain and give controlling effect to the intention of the parties as reflected by the different instruments. In the reservation contained in the deed from Stein and wife to Klein, above copied, appears this provision: ' * * * And it is further understood that grantors herein are not to participate in any oil lease or rental bonuses that may be paid on any lease on said above described land and hereby waive any rights they may have or be entitled to in any future oil or gas lease.' We must ascribe some meaning to this language. *At least, it discloses that the parties contemplated that a mineral lease would be executed.* The only persons with authority to execute the lease would be the owners of the minerals, and the Steins waived their right to participate in it. Impliedly, if not expressly, that waiver was in favor of the vendee, Klein, and his assigns. Without resort to other instruments interpreting this language, *we incline to the view that it should be construed as empowering Klein and his assigns to subject Stein's interest to a mineral lease,* but, when resort is had to other instruments appearing in the record, all doubt as to the intent so to empower them is removed." (Emphasis supplied.)

It is not clear from this quoted portion of the opinion just what effect the Court gave to that portion of the reservation reading " '* * * and hereby waive any rights they may have or be entitled to in any future oil or gas lease' " in reaching the conclusion to the effect that under the reservation Klein and his as-

signs had the right to subject Stein's interest to a mineral lease. Certainly the Court did not intend to hold that by the last-quoted language of the reservation Stein waived his rights to royalty yet rights to royalty are rights that Stein would have had under an oil and gas lease. This quoted portion of the reservation to me was, in effect, a reiteration of the fact that Stein was not to receive any part of the bonuses or delay rentals paid for and under oil and gas leases, but, be that as it may, the decision in the Klein case to the effect that Baker had the authority to include Stein's interest in his lease to Weinert is based on the instrument executed by Stein and Baker, above referred to, and other deeds, some executed by Stein and others by Baker, which showed clearly that the Steins intended to reserve only a royalty interest in their deed to Klein. That being true, it could be said that the holding in the Klein case does not compel a holding in the case at bar that under the reservation here in question plaintiffs had the right to subject the entire mineral estate in the tracts of land in question to an oil and gas lease, but, in my opinion, the portion of the opinion, above quoted, is a strong indication of the tendency of the courts in Texas to construe mineral reservations in deeds in favor of the grantee when there is any doubt as to the construction of the reservation.

■ In order to construe the reservation here in question the rules covering construction of deeds, above mentioned, must be applied. Applying those to the deed from Lincoln to Bryant and the reservation with reference to the mineral estate therein contained, I find and conclude that Lincoln by said deed intended that the grantee in said deed and his assigns should have the power and authority to subject the entire mineral estate in the tracts of land covered by said deed to oil and gas leases and that the mineral estate reserved by Lincoln in said deed was to become a royalty inter-

est under any oil or gas lease thereafter executed by the grantee in said deed or his assigns. To hold, as contended by Lincoln, that plaintiffs had the right to include in an oil and gas lease only an undivided one-half interest in the minerals would, in effect, limit plaintiffs to bonuses and delay rentals on only an undivided half interest in the minerals, because under such a construction Lincoln could, as the evidence shows it did with reference to the leases here under consideration, refuse to negotiate for and execute an oil or gas lease covering its claimed half interest in the minerals that provided for a bonus and delay rentals. Certainly such was not Lincoln's intention at the time it executed the deed to Bryant. Under the interpretation herein given the reservation in question Lincoln's interest in the minerals will be protected. In addition to the self-interest on the part of the plaintiffs that should require them to protect Lincoln as to the amount of royalty reserved in oil and gas leases, Lincoln has the right to require of plaintiffs the utmost fair dealings with reference to providing for the payment of appropriate royalty in any oil or gas lease that the plaintiffs execute covering the lands in question.[7] Under the facts in this case I find that the plaintiffs in executing the September, 1954, leases, above referred to, dealt most fairly with Lincoln with reference to the royalty provided for in said leases.

In view of the findings and conclusions hereinabove made and reached, judgment will be entered declaring:

(1) That the plaintiff, Harry Hudgins, has the power and authority to subject the entire mineral estate in the First Tract to an oil, gas and other minerals lease;

(2) That the plaintiff, Lee Hudgins, has the power and authority to subject the entire mineral estate in the Second Tract to an oil, gas and other minerals lease;

(3) That the oil, gas and other minerals lease executed by the plaintiff,

---

7. Schlittler v. Smith, supra.

Harry Hudgins, on September 22, 1954, in favor of Shell covering the First Tract is valid and covers the entire mineral estate in the First Tract;

(4) That the oil, gas and other minerals lease executed by the plaintiff, Lee Hudgins, and wife on September 22, 1954, in favor of Shell covering the Second Tract is valid and covers the entire mineral estate in the Second Tract;

(5) That the plaintiff, Harry Hudgins, is entitled to be paid the entire bonus in the amount of $6,454.96 that Shell agreed to pay for the lease executed by the said Harry Hudgins on September 22, 1954, covering the First Tract, $3,217.48 of said bonus having heretofore been paid by Shell to the said Harry Hudgins;

(6) That the plaintiff, Lee Hudgins, is entitled to be paid the entire bonus in the amount of $7,962.54 that Shell agreed to pay for the lease executed by the said Lee Hudgins on September 22, 1954, covering the Second Tract, $3,981.27 of said bonus having heretofore been paid by Shell to the said Lee Hudgins; and

(7) That the defendant, Lincoln, is entitled to one-half of the royalty provided for in said September, 1954, leases or any other valid oil, gas and other minerals leases executed in the future covering the tracts of land in question or any part thereof.

As above indicated, Lincoln by its cross-action seeks a partition of the mineral estate in the two tracts of land in question. The partition is sought under the provisions of Article 6082, Vernon's Civil Statutes of Texas, Annotated. This partition statute confers the right to compel partition in the broadest terms.[8] If Lincoln owns an undivided one-half interest in the mineral estate as distinguished from a royalty interest, there can be little doubt but that Lincoln would be entitled to the partition prayed for, but if Lincoln's interest is, in effect, only a royalty interest, as it is

herein held to be, Lincoln has no right of possession of any portion of the mineral estate, and therefore, has no right to compel a partition of the mineral estate.[9] The partition prayed for by Lincoln will be denied.

All costs of Court herein will be adjudged against Lincoln.

This memorandum decision will constitute the findings of fact and conclusions of law in this case as provided for by Rule 52, Fed.Rules Civ.Proc., 28 U.S.C.A.

---

8. Moseley v. Hearrell, 141 Tex. 280, 171 S.W.2d 337.

9. Lane v. Hughes, Tex.Civ.App., 228 S.W.2d 986, 988 and cases therein cited.